Mr. Altman and Mr. Todt, both of you, I thank you for your service under the Criminal Justice Act. I certainly greatly appreciate it. Thank you very much, Your Honor. It is heartfelt when I say it's always a privilege to appear before this Court. I'd like to talk about disparate sentencing, Your Honor. Bo Beckman got 30 years in this case. The kingpin in the conspiracy, Trevor Cook, received 25, and his second-in-command got seven and a half years, four times less than Mr. Beckman. Our position, at the time of sentencing, and incidentally Trevor Cook was tried earlier, and he was sentenced by then Chief Judge Rosenbaum, but at the time of sentencing, District Court Judge Davis gave no explanation as to why Mr. Beckman, who is essentially a minnow, got five years more than the shark, Trevor Cook. He didn't mention it orally at sentencing. He authored a lengthy statement of reasons and didn't discuss it, and it's Mr. Beckman's position that this failure to explain the disparity requires a trial. It seems to me, Your Honors, that if it's not remanded, we've got a hopeless conflict in this circuit between the teaching of Abbey Cole and other cases. What do I mean by that? In Abbey Cole, Mrs. Cole went to trial, just like Mr. Beckman. She was tried with her husband, who ended up getting a hundred and eighty months, and Judge Davis, with very little explanation, gave her a sentence of probation, a very lenient sentence. This court, the government appealed that sentence, and this court sent it back and said, wait a minute, we can't do anything with this because you didn't explain your sentence as to why she was a probationer. In Mr. Beckman's case, he went to trial, just like Abbey Cole, and he got thirty years with no explanation. The point, Your Honors, is this. It can't be the law in this court that a sentence that reflects leniency has to be explained, and a sentence that reflects severity, like Mr. Beckman, does not. It's got to go back. Well, there was some explanation. I think your main complaint, and you correct me if I'm wrong, is the 3553A6 disparity, and the . . . I mean, there were differences between Cook and Beckman. Cook pled, Beckman didn't, and so forth. As I recall, Judge Davis did explain some of the reasons for her sentencing, plus she got a significant downward variance. Tell me, as you know, the pellet review now is very minimal on sentencing, so you've got to really tell us why is it where there's been a substantial downward variance, why we should intervene on your client's behalf. Well, number one, a couple of points there, Your Honors. Number one, the fact that Judge Davis might have given a downward variance, and I'll talk about that, is one thing. Totally separate from an explanation as to why there's a disparity. That issue, Your Honor, goes to the issue of the substantive reasonableness of the sentence. It doesn't go to the issue of whether it's procedurally erroneous. What would you require a district court to do? What should Chief Judge Davis have done to satisfy the explanation that he did fail to give? Well, I think we have a road map for that in the second call case. There, after the remand, Judge Davis made detailed findings, many of which were cited by this court in the call to opinion. That's what I'm suggesting, Judge Wallman, that the district court judge do. This is probably irrelevant, but I was struck after reading Beckman's lengthy, lengthy statement. Had he written that out beforehand, or was it extemporaneous? No, he had written it out. He wrote it out. Because I can't figure out, I mean, it's interesting whether he was a dupe or a narcissistic self-promoter or something between. It has nothing to do with the sentencing, but I can understand why Judge Davis may have taken quiet umbrage at the man's sheer arrogance. I mean, to be characterized as that, maybe he was being very remorseful. I don't know. The written record really doesn't tell us that, and it may be irrelevant. Nor does the oral record, but if I may, can I speak to this issue of downward variance? What the government is saying is, wait a minute, when all is said and done, Beckman got a 90 percent downward variance because his guideline range was 4,932 months. Which figures out to 371 years, I guess, something like that. I haven't done the math, Judge. My calculator has done it, but I couldn't do it. This is an argument that they didn't make at the trial court level, and as a result, I'm reading through Judge Davis' statement of reasons this morning, and on page 21, he says he denies the defendant's request for a downward variance. So clearly, Judge Davis was not thinking about a downward variance in terms of 4,932 months to 360. He was thinking about something else. I would suggest, Your Honors, that given the fact that it wasn't set out below, that argument should be ignored. The thing that I always fall back on, or the Supreme Court case of Rita, where they said there was adequate explanation by the district court, and the district court, in that case, in the sentencing, said almost nothing. I don't know if you're currently familiar, but you're familiar with the Rita case, and it's hard for us to get involved in sentencing when the Supreme Court . . . explanation by the district judge when the Supreme Court affirms a sentencing in Rita that was very minimal at best. I appreciate that, Your Honor, but then the question, and certainly I'm not going to question this court, but there was very little explanation given in Abby Cole's case as to why she got a probationary sentence, and I don't recall seeing Rita as a basis to affirm that conviction, or as . . . There has to be some explanation. There's got to be some, and there wasn't any in this case. Your Honor, I've spent a lot of time on the disparity. I've got three minutes of rebuttal time. Unless you have any questions, I'll reserve the three minutes. I assume you stand on your other issues in the brief? I do. Okay. Thank you. Thank you. Mr. Toter. Good morning. Good morning, Your Honor. Thank you. And may it truly please the court, I represent Jerry Duran, who is an ordinary citizen who's in a contest right now with the most powerful entity the world's ever known, the government of the United States. And the only thing that makes this a level playing field are the rules. And in this case here, these rules were broken, bent, twisted, and whether it was out of good faith or bad faith, there ought to be and there are consequences to that. And I am, in large measure, resting on the briefs that you have, but our singular argument is that the cumulative effect of these rulings denied my client a fair trial. And when you look at the case law that guides you as to what you're supposed to do with an argument for cumulative rulings, the Carroll case and three or four others we cited, said you have to look at the case as a whole, the context of it. But you look at the context of it in the case of Mr. Durand, not the entire case, because these are three separate individuals, and they had three different sets of conduct. And in Mr. Durand, unlike the other two defendants, virtually everything that he did was equivocal. There was an explanation for it. There was, the government was then put in a position to somehow demonize him, and they did it through the tools of bringing into the middle of a fraud case, a drug case. They did it by unwittingly or not, not providing us with a very critical Form 302. They allowed Schammer to testify, their agent Schammer to testify, and all he had to do to justify his testimony was saying that I looked at the entire record, I looked at all the evidence, but then they wouldn't, the court wouldn't let us put on a critical piece of our evidence, of the government's evidence, which was the video that was taken with Mr. Durand. You don't have to answer this, but the district judge did allow you to use in cross-examination of Pettengill for impeachment purposes, this recording, but as I understand it, it was not used. Is that correct? If that's your understanding, it's not exactly correct, Your Honor, because the judge said that I could take Pettengill's statements out of that video and present them, but I can't put the video in front of the jury, because this was a conversation between two people, and to extricate just the statements that Mr. Pettengill made, there would be no meaning to it. So our position is that this video should have come in, it was evidence that the government took and then they decided they didn't like it, and it was the same evidence that the government said was relied upon by Mr. Schammer, Agent Schammer, who went on and on and on in violation, I believe, of Rule 701, and I made that point several times, several objections to that effect. Judge Davis stopped me after a while and said, he's an expert, he can comment on the evidence. Well, clearly, he's not an expert. If he would have been an expert, he would have had to do all kinds of things before the trial even started. So then I switched to Rule 702, and then the government jumps up and says, no, he's not an expert. So we have Schammer, and we have this egregious conduct of putting in this evidence about marijuana smoking. Juries are polarized regarding that subject matter. One juror, right in the middle of trial, one juror came up to a sidebar and said, I can't be a fair juror because I see that Mr. Duran smokes marijuana at work. And so the government asked that that juror be excused, and he was. If we would have known with a proper 404B presentation that we could have, we would have then wardered the jury on how many of them have in their family someone who had some tragic thing happen to them. We didn't get that opportunity because the government did not comply with Rule 404B, and that was allowed. So this is what went wrong, and the context of where it went wrong, strictly to Mr. Duran. Mr. Duran did not do the things that Trevor Cook did, or Mr. Beckman did, or Mr. Kiley. Mr. Duran was a guy in his 60s who had a fairly exemplary life. He was well-respected and trusted. That comes out by some of the people who talked about him. This whole operation started off legitimately, Pettengill, the government star witness said so. It morphed into an embezzlement by Trevor Cook, and Gerald Duran was fired on June 8th, 2008, and he did not participate in anything after that. He solicited no investor funds. That's borne out by the testimony of government witnesses. He thought he had an interest in this organization. He thought he still owned part of the stock. He had some communication, but he was not in there. His conduct was the least egregious. It was equivocal, and for that reason, these errors, the cumulative effect of these errors should allow Mr. Duran a new trial. I will reserve whatever time remaining for my rebuttal, please. You may. Thank you. Good morning. Is it Mr. Ritch? Mr. Ritch, Your Honor. Ritch. Kevin Ritch, appearing on behalf of Mr. Kiley. May it please the Court? Mr. Kiley's conviction must be reversed for several reasons, most significantly because his trial counsel, H. Nasif Mahmoud, labored under a conflict of interest that rendered his assistance ineffective under the Sixth Amendment. The Supreme Court set forth the test for evaluating such conflicts in the case Cooler v. Sullivan. That test requires, first, that an appellant show that there was a conflict of interest, and second, that that conflict of interest adversely affected the representation of the attorney. I have not gone back and looked at the record yet, but what happened, reading the briefs, it appears that Kiley insisted on having . . . Mr. . . . was it Mahmoud? Mahmoud, Your Honor. Mahmoud. Wanted Mr. Mahmoud to represent him when much of this was presented. What factually was going on there? Did Mr. Kiley make an informed and voluntary decision, or, as I understand, other than the count seventeen issues, he did understand what the situation was with respect to everything else? Your Honor, there was no presentation or discussion of the particular conflict that we're discussing today. There was a conflict hearing involving whether or not Mr. Mahmoud should be disqualified because he might have to testify as a witness, because he had knowledge surrounding some of the events that were alleged in the indictment, and the magistrate judge recommended that he not be disqualified because other witnesses could provide the same testimony if necessary at trial. None of those witnesses were ever called by the government or by Mr. Mahmoud. However, the conflict of interest arising from Mr. Mahmoud's potential criminal liability for his receipt of the $100,000 in stolen victim funds, which was referred to repeatedly at trial by government witnesses, by defense witness, and by Mr. Mahmoud himself when he was cross-examining a witness. He essentially entered unsworn testimony into the record by asking that witness, do you remember when you sent that wire to me? What was Pat's thinking at the time that he learned of the fraud? The implication that Mr. Mahmoud is connected to the fraud and the damage to his credibility by having that evidence repeatedly referred to in front of the jury, that was never discussed before trial. And Mr. Kiley, he's not an attorney, he's not a sophisticated individual. As a matter of fact, there was some question . . . He does have the right to pick his lawyer. He does. He does, Your Honor. Let me ask you this. What would a different lawyer have done? What different strategy? In other words, how was Mr. Kiley prejudiced? I didn't see that in your brief about how he was prejudiced, in other words, what different strategy or what would have been done differently by another lawyer? Well, most significantly, to mitigate, eliminate the taint on Mr. Mahmoud by the constant reference to his involvement with the fraud during trial, substitute counsel could have been retained or supplemental trial counsel could have been retained to bolster Mr. Kiley's credibility. This court in the Dewan v. Lockhart case, which we cite in our brief, dealt with a similar situation where an attorney was representing two defendants. One of the defendants, they were jointly charged with a burglary. One of the defendants named Stout pled guilty and at his plea colloquy he incriminated Dewan. At Dewan's trial, Stout testified, but he testified that Dewan had not been involved in the burglary. The prosecutor impeached Stout with his prior inconsistent statement and pointed at Dewan's attorney and said, Mr. Stout, you were represented during your plea colloquy, were you not thereby implicating the attorney, connecting him to the false statement? This court held that that was a sufficient adverse effect under Cooler to justify reversing Dewan's conviction. The damage to Dewan's attorney credibility transferred to Dewan and rendered the assistance ineffective. And that's exactly what we have here. Mr. Mahmoud's taint could only be removed by getting substitute counsel. At a minimum, there should have been some stipulation that provided there would be no reference to Mr. Mahmoud as the recipient of the stolen victim funds during trial, but that was not obtained either. And I think the Lopez Sierra case, which we discuss in our briefs, is instructive here. In that case, very similar, an attorney was accused of money laundering for being paid in the proceeds derived from the criminal activity of his client. And before trial, the government indicated that one of its witnesses was going to testify that indeed the lawyer had received the criminal proceeds. And the court engaged in an extensive process of obtaining or requiring that conflict counsel be obtained to advise the defendant about whether or not he should go forward with this lawyer as his attorney at trial. An extensive waiver hearing was held. There was a stipulation that this attorney would not be referred to during trial as the recipient of the funds to remove the taint. In that case, the court and the parties were sensitive to the effect of this conflict on the defendant. But that's not what we have here. Instead, trial proceeded, Mr. Mahmoud was repeatedly impugned in front of the jury by reference to his receipt of the funds and by himself entering unsworn testimony into the record admitting that he had received stolen victim investor funds. And there was a large volume of testimony at the trial about when the fraud was revealed, which was roughly the same time that Mr. Mahmoud was paid, and a jury could have reasonably inferred from this testimony and evidence that Mr. Mahmoud knew when he took the money that it was stolen from the victim investors. This inference was aggravated, the damage to Mr. Mahmoud's credibility in front of the jury was aggravated by the victim investors themselves who were testifying quite movingly about how they had been devastated by the fraud. And a juror in the juror box could not help but look out and see Mr. Mahmoud and think that's the man who stole $100,000 from these nice people. Now it's impossible for Mr. Mahmoud to adequately represent Mr. Kiley and comport with the Sixth Amendment when he's tainted in such a fashion. And so getting substitute counsel, obtaining a stipulation, those are things that should have been done and weren't done. And they're linked to the conflict because without the conflict, there would have been no need to make a decision about whether or not to obtain substitute counsel or whether or not to obtain a stipulation. That would not even have been at issue. So I see I have about two minutes left, I'm going to reserve the rest of my time for rebuttal. Thank you. Good morning, Mr. McLaughlin. Good morning, Judge Riley and other members of the panel, and may it please the Court. My name is David McLaughlin. I'm with the U.S. Attorney's Office in Minneapolis. I was one of two lawyers from our office who tried this case in front of Chief Judge Davis in April, May, and June of 2012. And as you know from the briefs and the arguments, there are several issues before the Court today. I would like to begin my argument by suggesting that the Court should view all of the issues before it through the prism of the absolutely overwhelming evidence that Mr. Beckman, Durand, and Kiley conspired with each other and with Trevor Cook and Chris Pettengill to fool and defraud the currency investor victims in this case. This was a beautifully coordinated, deftly executed fraud that had many moving parts, not least of which were the three defendants who went to trial. They all read off the same script. Every single time any one of the three were talking to a victim, the currency program always had fixed returns at a very attractive rate, 12%. They were always liquid, according to the defendants. People could get their hands on their money at any time. Indeed, the mantra was, you will have your money in segregated personal accounts. I was listening to one of Pat Kiley's shows on the way over here to the Court today, and he emphasizes that on his show. Your own personal account with your name on it is where your money is going to be. And of course, at all times, they told people, you can't lose it. It's fully hedged. And they knew better. Since Mr. Kiley seems to be most vociferously asserting that the evidence against him was insufficient, I'd like to just talk a little bit about that. This is not simply a case about Mr. Kiley making aggrandizing statements about himself, which certainly he did. The evidence very particularly showed he knew that this was in part a Ponzi scheme. As I just said, he told his victims over and over again, your money will be in your own account with your name on it. But his assistant, Julia Gilsrud, testified at trial that when people contacted Mr. Kiley to get their money back, he would go to one trough to get it. It was sometimes at Wells Fargo Bank. Later in the case, it was at Associated Bank. We introduced government exhibits 167, 168, and 169, which were snippets of bank records that showed that when people asked him for money, he would go to the same source to get it. He knew there weren't segregated accounts. Further, Julia Gilsrud testified that they made the statements up right there at the office in Tiffany Court. One would think that if Mr. Kiley believed that there were really segregated accounts at some financial institution or over at Crown Forex or wherever the CTA was, he would have sent them his victims' statements with their own names on them that he had no hand in creating. He made every one of them up with math, not with reference to some outside source of information. He mathed them up. Furthermore, these representations that have been dismissed as mere puffery aren't mere puffery. If you look at Mr. Rich's brief, in which he lays out a very nice paragraph of the false information Pat Kiley was passing on to his victims, that is an admission in the government's view of this fraud. It's not just puffery. He says in there, your money will be insured. We have $12 billion under management. I mean, these were huge misrepresentations, completely false. I mean, I could go on and on. As early as October of 2005, Mr. Kiley knew for a fact that Mr. Cook could lose money. That was when he, Kiley, lost Duke T.J.'s money. October of 05, T.J. came in, was a trial witness, took the stand, testified that Kiley told him that his money would be safer than if it was in a bank. And within about two weeks, T.J.'s $450,000, which by the way was his entire life savings, was gone. There were extensive email communications introduced at trial between T.J. and Kiley, where T.J. was complaining about the loss of his money. There was a lawsuit that put Kiley on notice that his money was lost. And Kiley didn't skip a beat. He changed none of the language that he used to attract his victims. He didn't do anything differently at all. In fact, Joseph Kalina, a later victim of Kiley's, also testified. And the literature that he received from Mr. Kiley was verbatim, identical to the literature that Kiley had used two years earlier to defraud Mr. T.J. So Mr. Kiley knew there weren't segregated accounts. He made up the statements.  He knew T.J. lost money. And he said things that the other defendants didn't say about this currency program. You know, one of the recurring themes at trial was, Kiley's not that smart a guy, and really he's the puppet of Trevor Cook. Well, the evidence didn't support that defense. For example, if you take a look at, I think it's government exhibit 344. If I'm wrong about that, I'm wrong. It's one of Kiley's written statements about the currency program, where he says, we are registered with NASD. There's SIPC insurance available. You are not going to lose your money. The government is backing this up. He even was specific about it, SIPC insurance. None of the other defendants said that. Trevor Cook didn't say that. Beckman didn't say it, and neither did Durand. He said he had $12 billion under assets. He talked about having offices in Liechtenstein and Dubai. I think the evidence is there to sustain Mr. Kiley's conviction. So I wanted to start with that. Let me go on to address the Beckman sentencing disparity argument. And I would like to respectfully correct a couple of things that I heard Mr. Altman say. First of all, he, Mr. Altman just, I don't think he was misrepresenting this. He may be misrecollecting it. Referred to Cook's trial. Cook did not have a trial. Cook pleaded guilty. And indeed, he provided the government with a lot of information and negotiated with the executive branch of the government a 25 year cap. And that cap was given effect by Judge Rosenbach. Mr. Cook acknowledged responsibility for this offense, negotiated a plea agreement, and benefited from it. That's why he got it. I think the argument is that the district court didn't give an explanation. There may be, they may not be admitting that there was a warranted disparity, but that the district court didn't explain it. Well, I am going to agree with Judge Bright, who I've heard many times say, I wish the district courts would write more down to give us more to go on. I don't see any problem with acknowledging that. But here, there are so many obvious differences between Cook and Pettengill and Beckman that the disparity and the reasons for it jump. It's right off the page here. The district court mentioned that it was sentencing all of them and brought, mentioned it, this is my description, but as a group, that he was looking at them as a group. And I think that's about it. Is that enough to say I'm familiar with Cook, I'm familiar with all this, and therefore, when I give you a sentence, I've weighed the sentences proportionally with everyone? I would suggest, Your Honor, that under the circumstances of this case, under Rita, that it is enough. And in that regard, I would distinguish this case quite dramatically from that of Abby Cole. In the following respects, the reasons the disparity was warranted are obvious on the face of the record. Trevor Cook pleaded guilty. He negotiated a 25 year cap for himself. Beckman, in contrast, has denied everything he ever did. He lied in front of Judge Davis in June, in September of 2009 in connection with that unrelated civil litigation. He well earned a two point enhancement for obstruction of justice. He did not receive any points off for acceptance of responsibility for obvious reasons. In addition, Your Honor, Beckman committed egregious frauds that Mr. Cook did not commit. He stole $13 million from the Quiggle family. And he did that largely by gaining the trust of, and then violating that trust, of two elderly people, Charlotte and Raymond Olson, both of whom Judge Davis saw testify. And so there's the NHL fraud, which was this blatant series of lies that Beckman told the NHL to try to become an owner of the wild. He told them he had a net worth of $21 million. He told them that he had never been sued or otherwise accused of any kind of dishonesty, when that was completely untrue. So there are plenty of differences here between Beckman and Cook. Whereas in Cole, Judge Davis went from 135 at the bottom of the range down to zero. Even after he had denied Abby Cole's motion for judgment of acquittal by saying that she was an active and important part of the conspiracy. So I think the reasons for the disparity and the reasons the disparity was warranted here are sufficiently evident on the record that no remand is required. If I may go on to the argument raised by Mr. Rich regarding Mock Mood. First of all, the United States agrees with the contention of Mr. Kiley that Kyler versus Sullivan provides the proper standard of review here. I believe our brief was wrong when it asserted that plain air. Kyler versus Sullivan does supply the standard of review. And under that case, in order to secure a reversal of a conviction under the Sixth Amendment, the defendant has a fairly heavy burden. The defendant has to show active representation of conflicting interests by the trial counsel and an adverse effect. Only if you show active representation of conflicting interests and an adverse interest do you get relief under Kyler versus Sullivan. Only then is prejudice presumed. Your Honors, this was a 1957 count that Mr. Rich is asserting over and over again implicates Mr. Mock Mood. It didn't implicate Mr. Mock Mood. 1957 is a money spending statute. It does not imply that the recipient of the funds is doing anything wrong. It only implicates the spender. And indeed, we have many cases where we charge a 1957 offense, where somebody brings dirty money down to a car dealership or somewhere else. And certainly the car dealership is not impugned by that. There is no suggestion in this record, and certainly none implied by the nature of 1957, that Mr. Mock Mood was somehow a fence here. And the cases cited by Mr. Rich are just simply distinguishable. I'll start with Las Piera Gutierrez, which is the DC circuit case from 2013. There, the lawyer apparently received dirty money. But the Department of Justice accused him of knowingly receiving dirty money. It implicated him. It informed the district court judge in that case and the lawyer himself, that the Department of Justice had initiated an investigation of him for the receipt of those funds. Nothing like that happened here. We knew that Mr. Mock Mood was present at certain meetings at the Van Dusen mansion during July of 2009 that gave us a concern that he might be a necessary witness. We saw this as a necessary witness conflict, and we acted on it that way. We brought this to the attention of Magistrate Justice Keyes. We had a hearing on it, and Judge Keyes ruled that there were other witnesses there who could stand in for Mr. Mock Mood with the result that he was not a necessary witness and should not be recused on that basis. I want to point out to you that there were two prosecutors there who had a significant interest in defense counsel not having a conflict, and there was a magistrate judge who looked right at this through the prism of Rule 5.7, and a very experienced district court judge, Chief Judge Davis. None of us saw this issue. None of us did. That's because it really was not there. Nobody accused Mr. Mock Mood of knowing that this was dirty money. The government had no basis to prove he knew it was dirty money. He never worried about his own culpability. He acknowledged having received the funds, but I don't see how that implicates him in any offense. And furthermore, his defense of Mr. Kiley was vigorous, and I don't know how a different lawyer would have done it differently. His defense of Kiley was, Kiley didn't know this was dirty money. Cook sent him the money. Cook is the bad guy here. Kiley had no reason to know that this was dirty. That was his defense. I mean, I think that would have been the defense of any lawyer. I frankly don't see any adverse effect here, even if there's some kind of an actual conflict. I do think it's important that nobody noticed this. There's no evidence in the record that he was implicated, that Mr. Mock Mood was implicated. I would suggest to this panel that since this issue has been raised here on direct appeal, on the record it was raised on, that this panel can dispose of this claim now on the record as it exists. But if the panel doesn't feel comfortable doing that, certainly we could develop a record. That's what 2255s are for. Again, my first suggestion is, in as much as Mr. Kiley has chosen to raise it here on direct appeal, dispose of it here. But if not, kick it back to a 2255 and we'll have a hearing. One last suggestion about this particular argument. It strikes me, your honors, that it proves a bit too much. Are we really in a situation where in every case where a lawyer gets paid out of funds that aren't clean, that there's an actual conflict of interest? This happens all the time. I mean, in all kinds of cases, white collar cases especially where there's a retained lawyer, it turns out that some or all of the fees that get paid to the lawyer came from the criminal activity. Judge Riley, as you pointed out several times earlier, there is a countervailing doctrine under the Sixth Amendment, countervailing to the doctrine of having unconflicted counsel, and that doctrine is the doctrine of counsel of your choice. Are we really going to have a rule that comes out of this case that says that any time a lawyer receives any dirty money, even if the lawyer doesn't know it, that defendant is not going to get the lawyer that defendant wants? Is it up to us? I mean, if we know that the money, if we know that a lawyer likely to be trial counsel has received money, is it simple enough for us just to charge a 1957 to exclude the lawyer? I mean, this doesn't make any sense. So, there was no conflict here. And really, I think that's the bottom line. I'd like to address now Mr. Toder's argument with respect to Mr. Durand. As I understand his argument, it is something like this, that the evidence against Mr. Durand was equivocal, and as such, we, the government, had to resort to unfair tactics, rule breaking, the introduction by surprise of polarizing unfairly prejudicial evidence, and so forth. First of all, the evidence against Mr. Durand was not equivocal, not one bit. We introduced, for example, his SEC deposition testimony, in which he says Trevor Cook, the purported mastermind here, was to his core a liar. Mr. Durand testified in front of the SEC that he well knew that Trevor Cook lost money. He testified before the SEC that the Shariah Bank component of this scheme was a fiction, that you certainly can't borrow money for free from Arab banks. His conduct during the scheme, he was there, Mr. Durand was, in the mansion when the lawyers were in there, Mendelsohn and Berman, telling them this is an illegal scheme. It violates the securities laws of the United States. It is likely a Ponzi scheme. Put distance between yourself and Mr. Cook. Stop doing this. And Mr. Durand kept going. He ended up leaving the mansion shortly after that, and this is a big point of contention in Mr. Durand's brief, to prove that he continued to be involved in this scheme. Even after he physically left the mansion, Your Honors, we introduced at trial Government Exhibit 115, and I respectfully commend it to your attention. In Exhibit 115 are gathered numerous emails in which Mr. Durand is telling various people, hey, I left the big house, the Van Dusen mansion. That's the only thing that's changed. I mean, I'm still going to be writing the newsletters. I'm still an owner of the Oxford. I'm still, and later, even three months later, he's meeting with Trevor Cook, with two of his victims, the Myers father and son duo from, I think, Maryland. He knows what a mess this is. He knows it's all fraud. At that point in time, Mr. Cook is paying him to be silent, and indeed, silent he stayed. And both of the Myers, Mr. Myers is now deceased, unfortunately, but he worked for a long time building a trucking company. He had a pretty substantial net worth of $12 to $15 million, and he lost all of it. He lost his house, and this was the direct result of Mr. Durand knowing that this was a fraud, but not telling him that it was a fraud in November of 2008 at a meeting at the mansion with Trevor Cook. Mr. Durand's repeated assertions that he withdrew from this conspiracy in May or June of 2008 are unsupported by the record. Well, there's a difference between remaining silent when he has no obligation to speak and taking an act to further the conspiracy. Were there acts that he took to further it other than just keeping his mouth shut? Yes. He reviewed newsletters as they went out. If you look at Government Exhibit 115, he was still reviewing the newsletters that went out to victims. He was maneuvering to try to get Trevor Cook excluded from control of the money so that he could come in and control the money. He was attempting with Chris Pettengill to open a new company to do the same thing, a company called Swiss FX. And furthermore, even though he didn't have a legal obligation to come forward and speak, sometimes even if you don't have a legal obligation, remaining silent is inculpatory. His claim before this court in his brief is, and I think this is a quote, he wanted to expose Cook's treachery. I think that is exactly how Mr. Toder wrote that in the blue brief. Where does Mr. Durand expose Mr. Cook's treachery? That's exactly what he didn't do. He knew about all this stuff and all he cared about was somehow trying to continue this to wrest control of it for Mr. Cook and keep on going. In other words, is it your argument that he did not make a clean break from this, whatever it was, a conspiracy? Absolutely. He did not unequivocally withdraw from it? Correct. He left the mansion and his physical departure made very little difference to what he continued to do. And his involvement and his desire to remain involved and his desire to keep reviewing newsletters and his desire to be an owner of the Oxford is reflected in numerous emails in Government Exhibit 115. You say he reviewed the newsletters. Anybody can read the newsletter.  In general, approving them and saying, okay. Yes. And he was communicating with Chris Pettengill and Pat Kiley about trying to restrict Trevor Cook's access to money. And there were various machinations going on in the background where he's clearly intending to stay involved and intending to exercise control over the communications with the investors and the control of the money. And indeed, Your Honor. Let's talk about the recording. I assume that's in your notes to get there. Let's talk about the recording, how that came up, how the district court handled it. Are you referring, Your Honor, to the recording between Chris Pettengill and Mr. Durand out at the... Right. And their argument that they wanted to use it.  Wants to offer his own exculpatory statements. That's not going to come in under the hearsay rule. Here, Chief Judge Davis, so help. He did, however, hold that to the extent Pettengill said things that could be used to impeach him or other government witnesses, that that would be allowed to be done. I understand Mr. Toder's argument that there's context and conversations between two people. But if Mr. Pettengill made a statement during that taped encounter at the Hotel Sofitel, which could be used to impeach him, I don't see how Chief Judge Davis's order could be any more clear that that was allowed. If Mr. Toder had marshaled those statements, he could have asked Mr. Pettengill about them. And to whatever extent they helped impeach Mr. Pettengill, they would have. But he didn't do that. I don't think this is a very hard issue. We oftentimes take a shot at it, go out and do a surreptitious recording of a defendant. Sometimes they're wary and they say things that are exculpatory, and that was the case here. So we decided not to offer it. May I speak a bit about the allegation that we surprised Mr. Durand with polarizing drug evidence? Is that something you would like me to address? You may. This argument is utterly unsupported by the record. We wrote a very detailed trial brief that we submitted a month before trial, in which we put the court and all three defendants on notice that we intended to introduce evidence that there was drug and alcohol activity going on at the castle. And the purpose of this evidence was obviously not to just dirty people up. These guys, remember Trevor Cook ran the castle. Trevor Cook's office was there. This was the headquarters of the entity that supposedly was running the most advanced, sophisticated investment program in the United States. No risk, 12% returns, liquid, segregated accounts. Really? Really. This was the same headquarters where Mr. Cook was drunk all day, where Mr. Durand was smoking marijuana with his assistant, Stephanie Bolton. And as to Mr. Durand, this evidence was particularly relevant because he wrote in his literature that our people are our greatest source of pride. He claimed to his victims that everybody who worked at these entities were licensed, highly respected financial professionals. And they just weren't. He, for example, hired a young man named Jared Jenkins from Rick's Cabaret. He was a towel guy in the bathroom over there, I guess. And they sealed the deal over a joint at the mansion. That kind of thing, his activities with Ms. Bolton were entirely inconsistent with his claim that I thought this was a legitimate business. I thought that this was what I was telling people it was. It was directly relevant to his intent to defraud. And I might add, I guess this isn't in the record, but we did hand out every memorandum in the case except for that one Pettengill one, which we missed by mistake, including two memoranda reflecting statements by Ms. Bolton to us in which she talked about drug use at the mansion. Any claim that this was somehow slung at Mr. Durand by ambush, unfairly, in order to overcome equivocal evidence is simply unsupported by the record. Still, what about the, was it true that one of the jurors asked to be excused because he or she was disturbed by the evidence of this drug use? Yes. On day five, when Ms. Bolton was on the stand, one of the jurors, a young man, raised his hand and came up to sidebar. And at sidebar, he told Chief Judge Davis that he was a marijuana user. And at that point in time, he wasn't sure that he could be fair to the government. And for that reason, Chief Judge Davis dismissed him. He, he said, I actually don't think I can be fair to the government. Now, let me add, it's interesting. In other words, he did not ask to be excused because he was offended by what was taking place at the big house? No, he asked to be excused. He was sort of laudatory of them or certainly not offended by what they are doing. Almost laudatory. I mean, he came up to sidebar and said, you know, I... He's, he's in the avant-garde as exemplified by our good citizens in Colorado. I have no doubt he's moved to the mountain state by now, Your Honor. Perhaps he took to heart our Commander-in-Chief's admonition that marijuana is no worse than alcohol. I, with that, I, I will end my argument without commenting on that comment. Thank you, Your Honor. I'll ask you one additional, one question. And that is, was anybody ever dissuaded from going to authorities, whether the state and federal level, there's two sets of people that control this stuff, to check it out? Were they ever dampened their enthusiasm? Don't worry, we'll take care of it. They, excuses. Well, I think the evidence fairly suggests that Mr. Durand was dissuaded from doing that because Mr. Cook was paying him to be silent. Other than that, I'm not aware in the evidence of any of the defendants obstructing anybody else from going to the authorities. I'm not aware of any evidence like that in the case. The only answer I have for you is Durand was paid by Trevor Cook not to. Back to this drug use. And of course we don't sit as second guessers. First case I ever tried, a state's attorney was reversed because they got some hearsay evidence in. So I know what that's like. This was an eight week trial, wasn't it? Yes, it was. Why jeopardize it? Anyway. And I suppose you could say a sub silencio, well, no harm, no fault. With all the overwhelming evidence. Come see, come solve. Well, that's my extemporaneous argument for the day. So pay it no mind. Pay it no mind.  Your time's expired. Thank you. Okay. Thank you, Your Honors. Mr. Altman, you have a little over three minutes. I've got three minutes, Your Honors. I'm not going to use it. I think you've probably heard all you want to hear about disparaging sentencing in this case. Mr. McLaughlin made no reference to any other portions of my brief. And if, unless the court has further questions of me, I'll stand on the Mr. Beckman's brief and reply brief. I guess not. Thank you. I'm not going to make any more gratuitous comments. Although there's one I'd like to make if, well, forget it. Thank you very much. Thank you, Mr. Beckman. Or thank you, Mr. Altman, for Mr. Beckman. Thank you. Thank you very much. Okay. And Mr. Toter, on behalf of Mr. Duran, you have a little over five minutes. Thank you, Your Honor. Your Honors. I would like to comment briefly on what Mr. McLaughlin said about a few things. One thing he said that after June 8th, 2008, that was when Jerry Duran got fired. Mr. McLaughlin said there was very little difference. Well, Agent Schammer, who pretty much knew the whole case, said that Mr. Duran did not solicit any more business for the currency program after June 8th when he was fired. Mr. McLaughlin also said that if you had looked at the F-302s or the statements that Ms. Bolton was the one who testified that Gerald Duran used marijuana, we would find that somehow we'd have a clue about the testimony. Your Honor, all of the Form 302s that were relevant to that issue were, I believe, there's an affidavit by Carol Dawson that's part of the record. Let me ask you how that came in, because I've just read the briefs, haven't read the testimony. Was that marijuana use and the alcohol use, was that acquired about by the government or did the witnesses volunteer it? At some point in the trial, the government counsel told the judge that they want to introduce evidence of marijuana smoking by Mr. Duran because, well, they wanted to do it. And they suggested that they put Ms. Bolton on the stand without the presence of the jury to see whether or not they could show a relevance. The judge said there better be some relevance between Mr. Duran smoking marijuana and the issues in this case. Without the presence of the jury, Ms. Bolton got on the stand and the issue was inquired of by the government. The jury, Duran, smoked dope outside of the mansion with her several times. The government argued that this is somehow indicative of people not being able to run a regular business. If they smoked marijuana, how could they? And the judge said, all right, we'll let it in. Then Ms. Bolton testified with the jury present and said all kinds of things about it. You answered my question. So it was purposeful by the government. Yes, absolutely. Go ahead. Mr. McLaughlin also said, as an example, that Mr. Myers, one of Jerry Duran's clients, lost $15 million. The record is clear that the total amount of money lost by Mr. Duran's clients, his 17 clients, was under $6 million. And when the argument was made that the juror that up and left, that quit the case, because it was removed from the case, that he was actually for Mr. Duran, and that somehow makes things okay, it just shows how polarized we are in this country about drug use. Who doesn't know some family where there was drug use and some devastating thing happened? So you're going to have people who are for marijuana, the people in Colorado, who are Carl Sagan, smoke marijuana every day. And there are some people who have been devastated. It's a very polarizing thing, and it's something that should have been brought to the attention, to our attention, with Rule 404b, before trial, so we could have handled that in voir dire. And the only reason any of this is relevant is because Mr. Duran's conduct was equivocal. When he testified before the SEC and said he knew this, he knew this, he knew it then. He didn't say he knew it back during the time that all this was happening. And I think it's very important, looking back at the record, you see when these things happened and what people knew when these things happened. The emails, Exhibit 115, Jerry Duran is saying, yeah, I read this. Jerry Duran believed that he still had an interest in this business, because he was promised that he was going to get, remember, this business started off legitimately, that he was going to get part of this. And he didn't broadcast this to the world. These emails went to people like Eric Newman. He wasn't in the conspiracy. He saw what was going on. He blew the whistle on Crown Forex, and he was fired. And he tried to start a legitimate business with Chris Pettengill. He wanted to have the same clients that he brought into the currency program out of there and into this legitimate, transparent program, which proves that he certainly thought the money was still there if he was going to take them out. So this is an equivocal record. And the cumulative effects of all of these things, the marijuana, the not letting us put the video on for Mr. Schaumer, the Form 302 that was not revealed, these deprived him of a fair trial. And we respectfully ask that it be so allowed. But back to your client. Did he ever specifically disavow what his co-conspirators had been doing? Did he ever make a clean break from this operation? Yes, he did make a clean break from this operation. For saying and doing what? Well, when he was fired, he never went back. And when he started a whole new company that was designed to put people into a legitimate, transparent business, that was his clean break. He was paid $75,000 on a downstroke and then $15,000 a month by Cook to not take his clients out, which is something a legitimate business would do when you have a non-compete agreement. I'm not sure I understood Mr. McLaughlin's argument correctly. I think he said that even though Mr. Durant had no legal obligation to speak, his failure to speak could be what? Considered as evidence of his continued participation or what? Well, that is an inference. I don't know that Mr. McLaughlin made that argument. In other words, did he have any obligation whatsoever to alert anybody to what this scheme had done? No, he didn't do anything to alert anyone, but the scheme was done because that would have caused everything to collapse. And he wanted to get his clients out of the tentacles of Trevor Cook. I see. Okay, thank you. Thank you. Mr. Rich, you have a little over two minutes. Thank you, Your Honor. Just a couple of points. First, Mr. McLaughlin asked that the court view the issues on appeal through, quote, the prism of overwhelming evidence. There's one issue that cannot be viewed through that prism, and that is the conflict issue. Because as the Supreme Court set forth in Kyler, prejudice is presumed when there's an attorney conflict and an adverse effect present. And that's the situation we have here. So the overwhelming evidence is not relevant to a determination of whether or not. Well, I guess back to my point is that it certainly arguably waived any conflict, except I guess they didn't address this count 17, which I have in my notes and I don't remember what count 17 is. But, you know, did he waive everything other than count 17, whatever that is? There actually was no waiver solicited with regard to the rule 3.7 conflict either, Your Honor. The magistrate judge simply recommended that disqualification was not required because other witnesses could provide the relevant testimony. There was no discussion on the record of the conflict hearing, I believe, with regard to the 3.7 issue. There were other former and current client conflict issues that were addressed, but not the rule 3.7 issue, and certainly not the issue of the conflict of Mr. Mahmoud facing potential criminal liability, potential civil forfeiture of the $100,000, and potential disciplinary action for his receipt of those funds. So prejudice is not- Was it Mahmoud's explanation for all of this, or didn't he give any explanation? Not that I'm aware of, Your Honor. Mr. McLaughlin suggested that this court should avoid a rule where an attorney who's paid in his client's illicit funds would automatically be disqualified. That's not the rule we're asking for here. What we're asking for is a rule that's consistent with the rule that's been articulated by other courts that have considered this issue, including the Second Circuit, the Third Circuit, the Fifth Circuit, the Ninth Circuit, and the D.C. Circuit, that if an attorney is burdened by a conflict of interest because he fears potential criminal liability or other sanction because of his connection to his client's crimes, a conflict exists. And if there's an adverse effect as a result of that conflict, then the conviction must be reversed. And did you or somebody on behalf of Mr. Kiley raise that in the district court, that same argument? Your Honor, we did not represent Mr. Kiley on- Well, whoever represented him. Mr. Mahmoud did not raise this issue at trial. No objection from the defense about proceeding, and understandably so because they- I can understand why he wouldn't, but- Yeah, they withdraw scrutiny to the issue. At any point, when did Mr. Kiley get new counsel? Did he have a motion for new trial or sentencing or any- The circumstances were slightly odd, so if the court will just permit me one minute to explain what happened at Mr. Kiley's sentencing. He informed the court that he had discovered Mr. Mahmoud had put a self-aggrandizing testimonial on an attorney website purportedly from Mr. Kiley talking about what a wonderful job Mr. Mahmoud had done at trial, and also that Mr. Mahmoud had not shown Mr. Kiley the pre-sentence report prior to sentencing. For those reasons, the court removed Mr. Mahmoud during that hearing and then appointed new counsel, which is my colleague John Lundquist and myself, and at that point we took over and represented Mr. Kiley at sentencing and then on this appeal, Your Honor. Okay. Did you at that time, it may not have been any vehicle to do it, but at that time did you raise the conflict? We did not, Your Honor, and to be honest, this case is so large and the record is so large, we never understood the scope, the nature, and the damage that had been done by this conflict until we had a chance to review the trial record. Okay. Thank you very much. Well, it's a very complex case and we thank you for your arguments, both presented in your briefs but presented here today, and we will take it under advisement and be back to you as soon as we can. So thank you very much.